William A. Delgado (SBN 222666)
wdelgado@dtolaw.com
DTO LAW
915 Wilshire Boulevard, Suite 1950
Los Angeles, California 90017
Telephone: (213) 335-6999
Facsimile: (213) 335-7802

Attorneys for Defendant
INSOMNIAC HOLDINGS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AUSTIN BALLARD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSOMNIAC HOLDINGS, LLC,<br><br>Defendant. | Case No. 3:25-cv-00811-SI<br>Hon. Susan Illston<br><br>**DEFENDANT INSOMNIAC HOLDINGS, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*Filed concurrently with Request for Judicial Notice, Declaration of William D. Irvine Jr., and Proposed Order*<br><br>Date: May 16, 2025<br>Time: 10:00 a.m.<br>Place: Courtroom 1 |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on May 16, 2025, at 10:00 a.m., or as soon thereafter as this matter may be heard, before the Honorable Susan Illston, in Courtroom 1 of this Court, 450 Golden Gate Avenue, 17th Floor, San Francisco, CA 94102, Defendant Insomniac Holdings, LLC, will, and hereby does, move to dismiss Plaintiff's sole claim under the Video Privacy Protection Act (VPPA) pursuant to Federal Rule of Civil Procedure 12(b)(6), as well as Local Rule 7, for the reasons set forth below.

The bases for this motion are more specifically set forth in the accompanying Memorandum of Points and Authorities and include that the Complaint fails to state a claim for relief because (a) Plaintiff has not plausibly alleged Insomniac is a "video tape service provider" as defined in the VPPA; (b) Plaintiff has not plausibly alleged he is a "consumer" as defined by the VPPA; and (c) Plaintiff has not plausibly alleged Insomniac "knowingly" disclosed his personally identifiable information.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice and Declaration of William D. Irvine Jr., the complete record in this action, and such other matters and arguments as may come before this Court, including those raised in any reply memorandum and oral argument.

Dated: March 27, 2025 DTO LAW

By: */s/ William A. Delgado*
William A. Delgado

Attorneys for Defendant
INSOMNIAC HOLDINGS, LLC

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. STATEMENT OF ISSUES TO BE DECIDED ..... 3

III. RELEVANT FACTS ..... 3

A. Insomniac's Business and Website. ..... 3

B. Allegations Regarding the Facebook and TikTok Pixels. ..... 3

C. Plaintiff's Alleged Interactions with Insomniac. ..... 4

IV. ARGUMENT ..... 4

A. *Twombly* and *Iqbal* Require Plaintiff to State a Plausible Claim for Relief. ..... 4

B. The Complaint Fails to Plausibly Allege Insomniac Is a "Video Tape Service Provider" Under the VPPA. ..... 5

C. The Complaint Fails to Plausibly Allege Plaintiff Is a "Consumer" Under the VPPA. ..... 8

1. *Plaintiff is not a "subscriber" or "purchaser" of any audio visual goods or services.* ..... 8

2. *This Court should decline to follow the Second Circuit's outlier opinion in Salazar v. National Basketball Ass'n.* ..... 10

3. *Adopting the Second Circuit's conception of a VPPA "consumer" would lead to discordant and unreasonable results.* ..... 14

D. The Complaint Fails to Plausibly Allege Insomniac "Knowingly" Disclosed Plaintiff's Personally Identifiable Information. ..... 15

V. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tobacco Co. v. Patterson*,
456 U.S. 63 (1982) .......... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 4, 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4

*Brown v. Learfield Commc'ns, LLC*,
2024 WL 3676709 (W.D. Tex. June 27, 2024) .......... 10

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023) .......... 6

*Carroll v. Chick-fil-A, Inc.*,
2024 WL 1091193 (N.D. Cal. Feb. 13, 2024) .......... 6, 9

*Carroll v. Gen. Mills, Inc.*,
2023 WL 4361093 (C.D. Cal. June 26, 2023) .......... 5, 6, 7

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) .......... 12

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) .......... 5

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 16

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 13

*Gardener v. MeTV*,
681 F. Supp. 3d 864 (N.D. Ill. 2023) .......... 9

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) .......... 13

*Heather v. Healthline Media, Inc.*,
2023 WL 8788760 (N.D. Cal. Dec. 19, 2023) .......... 9, 12

*Hernandez v. Container Store, Inc.*,
2024 WL 72657 (C.D. Cal. Jan. 3, 2024) .................................................. 6, 8, 9, 12

*Hernandez v. Jostens, Inc.*,
2024 WL 1135165 (C.D. Cal. Feb. 7, 2024) .................................................. 6, 7

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .................................................. 15

*Hunthausen v. Spine Media, LLC*,
678 F. Supp. 3d 1228 (S.D. Cal. 2023) .................................................. 11

*Kuzenski v. Uproxx LLC*,
2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) .................................................. 11

*Marder v. Lopez*,
450 F.3d 445 (9th Cir. 2006) .................................................. 4, 5

*Mollett v. Netflix, Inc.*,
2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .................................................. 16

*Pileggi v. Wash. Newspaper Publ'g Co.*,
2024 WL 324121 (D.D.C. Jan. 29, 2024) .................................................. 11

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .................................................. 11

*Rodriguez v. Hershey Co.*,
2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) .................................................. 6

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .................................................. 9, 10

*Salazar v. Paramount Glob.*,
683 F. Supp. 3d 727 (M.D. Tenn. 2023) .................................................. 8

*Sturgeon v. Frost*,
577 U.S. 424 (2016) .................................................. 11

*Tawam v. Feld Entertainment Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) .................................................. 6, 9

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .................................................. 11

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .................................................. 5, 7

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) .... 4

*Yates v. United States*,
574 U.S. 528 (2015) .... 11

**Statutes**

18 U.S.C. § 1519 .... 11, 12

18 U.S.C. § 2710(a)(3) .... 1, 12, 14, 15

18 U.S.C. § 2710(a)(4) .... 1, 5, 8, 12

18 U.S.C. § 2710(b) .... 5

18 U.S.C. § 2710(b)(1) .... *passim*

18 U.S.C. §§ 2710 *et seq.* .... *passim*

**Other Authorities**

2 Oxford English Dictionary 695 (1989) .... 5

American Heritage Dictionary: Second College Edition 220 (1991) .... 5

Fed. R. Civ. P. 12(b)(6) .... 4, 5

S. Rep. No. 100-599 (1988) .... 14

Webster's New World Dictionary: Third College Edition 189 (1988) .... 5

Webster's Third New International Dictionary 302 (1981) .... 5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This lawsuit is an attempt to expand the Video Privacy Protection Act ("VPPA"), 18 U.S.C. §§ 2710 *et seq.*, far beyond its intended scope. In 1988, Congress passed the VPPA with a specific purpose in mind—to prevent businesses that sell, rent, or offer subscriptions to video content from disclosing the viewing history of customers who purchase, rent, or subscribe to that video content. This commonsense understanding of the statute is consistent with the circumstances of its passage—in direct response to a movie rental store leaking then-Supreme Court nominee Robert Bork's videotape rental list to a Washington newspaper.

It also comports with the text of the statute itself, which prohibits "video tape service provider[s]" from disclosing the "personally identifiable information" of their "consumer[s]." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is "any person, *engaged in the business* . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar *audio visual materials*." *Id.* § 2710(a)(4) (emphasis added). A "consumer" is "any renter, purchaser or subscriber of *goods or services from a video tape service provider*." *Id.* § 2710(a)(1) (emphasis added). And "personally identifiable information" is "information which identifies a person as having requested or obtained *specific video materials or services from a video tape service provider*." *Id.* § 2710(a)(3) (emphasis added).

Against this statutory backdrop, Plaintiff contends that Insomniac, a live music festival organizer, has violated the VPPA by deploying certain ubiquitous targeted advertising tools, including the Facebook and TikTok Pixels, on public-facing webpages containing promotional video content. But Plaintiff has failed to allege a plausible claim for relief under the VPPA for several reasons.

***First***, although Insomniac's website may contain certain embedded, promotional videos to advertise its live events, Insomniac is not a "video tape service provider" within the meaning of the VPPA. It does not operate a movie rental store,

streaming service, or business otherwise dealing in video content, nor does it generate income from such video content. Rather, as Plaintiff himself admits, Insomniac "specializ[es] in producing and promoting *electronic dance music festivals and events*." Compl. ¶ 1 (emphasis added), ECF No. 1. But the VPPA does not, and was never intended to, transform every business that merely uses video content to advertise its goods or services into a "video tape service provider."

***Second***, Plaintiff is not a "consumer" under the VPPA because he did not rent, purchase, or subscribe to any audio visual materials from Insomniac. Plaintiff alleges he signed up for a free email newsletter and purchased event tickets from Insomniac's website. Although these interactions might fairly be described as "consumption" in the broadest sense of the word, they are separate and distinct from the publicly available video offerings embedded on Insomniac's website—i.e., the core of Plaintiff's VPPA claim. The VPPA was never intended to create a federal privacy right for *any* interaction with *any* business that happens to use video content for marketing purposes. Rather, as the majority of courts to have considered this issue have held, the VPPA requires a factual nexus connecting an individual's consuming behavior with the video content at issue.

***Third***, Plaintiff has failed to allege that Insomniac "knowingly" disclosed any "personally identifiable information" ("PII"), as is required for an actionable claim under the VPPA. Among other reasons, because Plaintiff has not alleged Insomniac had knowledge of or was able to access Plaintiff's Facebook or TikTok identifiers and Insomniac cannot disclose information it never even possessed, Plaintiff's VPPA claim fails.

Accordingly, Defendant's motion to dismiss should be granted.

## II. STATEMENT OF ISSUES TO BE DECIDED

1. Whether Insomniac is a "video tape service provider" under the VPPA.

2. Whether Plaintiff, who does not allege he purchased, rented, or subscribed to any "prerecorded video cassette tapes or similar audio visual materials," is a "consumer" under the VPPA.

3. Whether Insomniac "knowingly" disclosed any personally identifiable information under the VPPA.

## III. RELEVANT FACTS

### A. Insomniac's Business and Website.

Insomniac is a "prominent event management company specializing in producing and promoting electronic dance music festivals and events." Compl. ¶ 1. In support of this music festival and event business, Insomniac operates a website, which contains a subsection of embedded YouTube "videos showcasing Insomniac TV, trailers for upcoming events, and recaps of past events." *Id.* ¶¶ 1, 31, 32; *id.* at 7 fig.1; *id.* at 8 fig.2; *id.* at 9 fig.3. Prospective festivalgoers can also purchase event tickets through the website. *Id.* ¶ 6.

### B. Allegations Regarding the Facebook and TikTok Pixels.

The Complaint alleges that Insomniac installed and uses Facebook and TikTok Pixels on its website. *Id.* ¶ 16. According to Plaintiff, when users "request or view audiovisual content on [Insomniac's] Website, the separate title of the video is transmitted to Facebook and TikTok alongside the subscribers' persistent and unique Facebook and TikTok[] identifiers, thereby revealing their Personal Viewing Information to Facebook and Tiktok [sic]." *Id.* ¶ 29. Nowhere does Plaintiff allege he ever provided to Insomniac his Facebook or TikTok identifiers ("FID" or "TID," respectively) or that Insomniac ever had possession or access to that information. *See generally id.*

### C. Plaintiff's Alleged Interactions with Insomniac.

Plaintiff has a "subscription to Insomniac's newsletter . . . , which he has used to stay informed of the upcoming events, promotions and shows advertised by" Insomniac. *Id.* ¶ 6. "[S]igning up for [Insomniac's] promotional Newsletter . . . requires providing one's email." *Id.* ¶ 15. According to Plaintiff, this subscription "provides access to exclusive ticket presale codes, festival announcements and information, new music releases, playlists, and ongoing contests and giveaways." *Id.* at 2 n.1. Plaintiff has also "purchase[d] event tickets" from Insomniac. *Id.* ¶ 6.

Plaintiff "also visited Insomniac's Website to watch prerecorded video content from his computer." *Id.* Plaintiff "used his Facebook account from the same browser that he used to request and view [Insomniac's] video content on the Website." *Id.* ¶ 7. Although Plaintiff "also has a Tiktok [sic] account," he does not allege he used that account from the same browser he used to visit Insomniac's website. *Id.*

## IV. <u>ARGUMENT</u>

### A. *Twombly* and *Iqbal* Require Plaintiff to State a Plausible Claim for Relief.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although it must accept well-pleaded allegations in the Complaint as true, the Court need not accept legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citing *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5

(9th Cir. 2003)). However, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448 (citations omitted). In such a case, "[t]he court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (cleaned up) (quoting *Marder*, 450 F.3d at 448). This evidence may include information posted on webpages that a plaintiff references in a complaint. *See id.*

**B. The Complaint Fails to Plausibly Allege Insomniac Is a "Video Tape Service Provider" Under the VPPA.**

The VPPA's scope is limited to disclosures by a "video tape service provider." 18 U.S.C. § 2710(b). A "video tape service provider" is defined as "any person, *engaged in the business* . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4) (emphasis added). "When used in this context, 'business' connotes 'a particular field of endeavor,' i.e., a focus of the defendant's work." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (citing Webster's Third New International Dictionary 302 (1981) (def. 1d); The American Heritage Dictionary: Second College Edition 220 (1991) (defs. 1a, 1b); 2 Oxford English Dictionary 695 (1989) (def. 14b); Webster's New World Dictionary: Third College Edition 189 (1988) (def. 1)). Thus, to be "engaged in the business" of renting, selling, or delivering audio visual materials, a "**defendant's product** must not only be **substantially involved in the conveyance of video content** to consumers but also **significantly tailored to serve that purpose**." *Carroll v. Gen. Mills, Inc.*, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (quoting *In re Vizio*, 238 F. Supp. 3d at 1221).

District courts in the Ninth Circuit have routinely held that businesses only peripherally engaged in the delivery of video content are not video tape service

providers. *See Carroll v. Chick-fil-A, Inc.*, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024) ("Under the plaintiffs' argument, any company that has more than one video on its website would be a VTSP. District courts within the Ninth Circuit routinely reject this contention.") (collecting cases); *Hernandez v. Container Store, Inc.*, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024) ("[C]ourts in the Ninth Circuit have recognized consistently that delivering video content must be central to the defendant's business or product for the VPPA to apply."). More specifically, courts have held that "[h]osting and creating prerecorded videos for the purpose of marketing [Defendant's] products does not suffice to plausibly allege Defendant is a video tape service provider." *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023); *see also Hernandez v. Jostens, Inc.*, 2024 WL 1135165, at *2 (C.D. Cal. Feb. 7, 2024) ("In summary, Defendant's videos ***market*** Defendant's goods; they are not themselves the goods on offer."); *Hernandez*, 2024 WL 72657, at *2 ("Defendant's videos . . . market Defendant's goods; they are not themselves the goods on offer."); *Rodriguez v. Hershey Co.*, 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023) ("At bottom, the videos on Defendant's website are part of Defendant's brand awareness and are not Defendant's particular field of endeavor."); *Carroll*, 2023 WL 4361093, at *3-4 ("The videos on the website are part of Defendant's brand awareness, but they are not Defendant's particular field of endeavor. Nothing suggests that Defendant's business is centered, tailored, or focused around providing and delivering audiovisual content.").

*Tawam v. Feld Entertainment Inc.*, 684 F. Supp. 3d 1056 (S.D. Cal. 2023), is instructive. In that case, a web user sued a live monster truck rally promoter for violating the VPPA by deploying the Facebook Pixel on its website. *Id.* at 1057-58. The web user argued that the term "video tape service provider" should encompass a live event organizer that uses free video clips on its public website to "'increas[e] its brand presence.'" *Id.* at 1060-61 (citation omitted). In dismissing the web user's VPPA claim, the district court explained that the web user's allegations did "not

support an inference that the videos viewed by Plaintiffs are more than peripheral to Defendant's business or that Defendant's website is significantly tailored to the purpose of conveying those videos." *Id.* at 1061.

This case is no different. Plaintiff *claims* Insomniac is a "video tape service provider" because it is "engaged in the business of promoting and delivering audiovisual materials—including the prerecorded videos that Plaintiff and the Class Members requested and viewed on the Website." Compl. ¶ 48. But this conclusory statement, without more, is insufficient to plausibly allege that Insomniac's business is "'substantially involved in the conveyance of video content'" or "'significantly tailored to serve that purpose.'" *Carroll*, 2023 WL 4361093, at *3 (quoting *In re Vizio*, 238 F. Supp. 3d at 1221); *see also Iqbal*, 556 U.S. at 678 (holding a court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements").

It is also belied by other allegations in the Complaint, which demonstrate that video content is ***not*** Insomniac's "'particular field of endeavor.'" *In re Vizio.*, 238 F. Supp. 3d at 1221 (citation omitted). Plaintiff himself characterizes Insomniac as, first and foremost, a "prominent event management company," and the videos embedded on Insomniac's website as merely "showcasing Insomniac TV, trailers for upcoming events, and recaps of past events." Compl. ¶ 1. The only video Plaintiff provides as an example in his Complaint is a promotional "Lineup Reveal" for an (at that time) upcoming live Insomniac festival in Las Vegas, Nevada. *Id.* ¶¶ 31-32; *id.* at 7 fig.1; *id.* at 8 fig.2; *id.* at 9 fig.3. Nowhere does Plaintiff allege Insomniac charges money or requires any other commitment in exchange for accessing this video content, nor can he. Any individual with an internet connection and a web browser can access these videos. *See* Decl. of William D. Irvine Jr. ("Irvine Decl.") ¶ 3, Ex. A. It is indisputable that Insomniac's videos serve a marketing purpose; "they are not themselves the goods on offer." *Hernandez*, 2024 WL 1135165, at *2. Taken together, the only reasonable inference supported by Plaintiff's allegations is that

Insomniac is "engaged in the business" of operating live music festivals and that the conveyance of "audio visual materials" on its website is no more than peripheral to that core business. 18 U.S.C. § 2710(a)(4).

To hold otherwise would open the door to VPPA lawsuits against *any* company operating a website that happens to contain embedded promotional video content, no matter how attenuated the conveyance of that video content is from the core of the company's business. The Court should join the majority of courts to have considered this question and reject Plaintiff's attempt to expand the reach of the VPPA in this way. Because Insomniac is not a "video tape service provider," Plaintiff's VPPA claim must be dismissed.

**C. The Complaint Fails to Plausibly Allege Plaintiff Is a "Consumer" Under the VPPA.**

Plaintiff's claim also fails for a different reason. The protections of the VPPA are limited to "consumers." *Id.* § 2710(b)(1). The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Because Plaintiff has not rented, purchased, or subscribed to any audio visual content from Insomniac, he is not a "consumer" under the VPPA.

1. *Plaintiff is not a "subscriber" or "purchaser" of any audio visual goods or services.*

Although Plaintiff claims to be a VPPA "consumer," not every interaction that might be labeled a "purchase," "rental," or "subscription" triggers the VPPA's protections. As courts in the Ninth Circuit and elsewhere have recognized, the VPPA requires a nexus between a consumer's rental, purchase, or subscription and the video content at issue. *See, e.g.*, *Hernandez*, 2024 WL 72657, at *3 (agreeing with the "litany of decisions recognizing a nexus requirement"); *id.* at *2 (collecting cases); *Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 744 (M.D. Tenn. 2023) (finding that a "plaintiff's interaction . . . [that] has nothing to do with video content . . . is ill

suited for a claim under the *Video* Privacy Protection Act"), *appeal argued,* No. 23-5748 (6th Cir. June 18, 2024); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill. 2023) ("The Court does not agree, however, with Plaintiffs' argument that the allegations that it opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act."). Put differently, the video content at issue must be bound up in the exchange creating the consumer relationship. *See, e.g., Carroll,* 2024 WL 1091193, at *1 ("[P]laintiffs have not alleged any nexus between their purchases at Chick-fil-A restaurants and the videos on Chick-fil-A's websites and are therefore not 'purchasers' under the VPPA."); *Hernandez*, 2024 WL 72657, at *2 ("[A]s numerous courts have recognized, the VPPA provides only 'for an action by a renter, purchaser [or] subscriber *of audio visual materials*, and not a broader category of consumers.'") (citations omitted); *Heather v. Healthline Media, Inc.*, 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023) ("The amended complaint does not allege that any videos were presented in the newsletters themselves. It also does not allege that plaintiffs received enhanced access to the videos, which were equally available to all Healthline's visitors. At most, the amended complaint established that plaintiffs subscribed to a predominantly written, not video, good or service, which is outside the purview of the VPPA."), *appeal filed*, No. 24-4168 (9th Cir. Oct. 2, 2024); *but see Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024) (holding that "[t]he phrase 'goods or services' in the VPPA's definition of 'consumer' is not cabined to only audiovisual 'goods or services'").

*Tawam* is again instructive. In that case, the plaintiff web user alleged he "signed up for an email mailing list provided by Defendant and separately viewed videos on Defendant's website." *Tawam*, 684 F. Supp. 3d at 1062. In holding the plaintiff had failed to allege he was a "consumer" under the VPPA, the district court explained the plaintiff's allegations were "not sufficient to plausibly support the existence of a nexus between the alleged subscription and the video content at issue." *Id.*

Here, Plaintiff alleges he is a VPPA "consumer" because he subscribed to Insomniac's free email newsletter and purchased Insomniac event tickets. Compl. ¶ 6. He separately alleges he "visited Insomniac's Website to watch prerecorded video content from his computer on a regular basis*."* *Id.* Nowhere does he claim, however, that he rented, purchased, or subscribed to the embedded "prerecorded video content" he watched on Insomniac's website. Nor does he claim his newsletter subscription or ticket purchases were in any way a condition to accessing that video content. The reason for this is clear—the YouTube videos embedded on the Insomniac website are free and publicly available to any individual with access to a web browser. *See* Irvine Decl. ¶ 3, Ex. A. Because there is no nexus connecting Plaintiff's alleged subscription and ticket purchases to the public video content he viewed while visiting Insomniac's website, he is not a "consumer" under the VPPA.

2. *This Court should decline to follow the Second Circuit's outlier opinion in Salazar v. National Basketball Ass'n.*

Plaintiff likely will rely on the Second Circuit's recent decision in *Salazar* to argue he is a VPPA "consumer" because he subscribed to a newsletter and purchased tickets—despite the fact that his subscription and purchases lack any nexus to Insomniac's video offerings. Consistent with that case, he will argue the words "goods or services" in the statutory definition of "consumer" should be interpreted to include *any and all* goods or services a company might offer, not just *audio visual* goods or services. The Court should reject this argument for at least two reasons.

***First***, the Second Circuit's decision is not binding on this Court, and the great weight of authority from courts in the Ninth Circuit (and elsewhere) supports interpreting the words "goods or services" in the VPPA to mean *audio visual* goods or services. *See supra* Section IV.C.1; *see also Brown v. Learfield Commc'ns, LLC*, 2024 WL 3676709, at *3 (W.D. Tex. June 27, 2024) (holding plaintiff was not a "consumer" under the VPPA where "he failed to subscribe to audio-visual content"), *appeal dismissed sub nom. Brown v. Learfield Commc'ns, L.L.C.*, No. 24-50632 (5th Cir.

Nov. 13, 2024); *Pileggi v. Wash. Newspaper Publ'g Co.*, 2024 WL 324121, at *10 (D.D.C. Jan. 29, 2024) (finding plaintiff's allegations "insufficient to establish a link between what plaintiff subscribed to, *i.e.*, the newsletter, and defendant's audio-visual content on its website"), *appeal argued*, No. 24-7022 (D.C. Cir. Feb. 27, 2025); *Kuzenski v. Uproxx LLC*, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023) (dismissing VPPA claim where plaintiff failed to "allege that becoming a subscriber is connected in any way to Defendant's video content"); *Hunthausen v. Spine Media, LLC*, 678 F. Supp. 3d 1228, 1233 (S.D. Cal. 2023) ("[T]he scope of a 'consumer,' when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of 'video tape service provider,' with its focus on the rental, sale or delivery of audio-visual materials.").

***Second***, the Second Circuit's interpretation of the VPPA cannot be squared with the plain language of the statute when viewed in its proper context. "Statutory language 'cannot be construed in a vacuum.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted). "Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words. Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (noting that "reasonable statutory interpretation" must account for both specific context of language used and broader context of statute as a whole).

In *Yates*, a commercial fisherman under investigation for harvesting undersized red grouper was indicted and convicted after he ordered a crew member to throw the offending fish into the sea. 574 U.S. at 531. The statute at issue, 18 U.S.C. § 1519, was enacted as a provision of the Sarbanes-Oxley Act and prohibited the knowing destruction of "'any record, document, or tangible object'" with the intent

to impede a federal investigation. *Id.* (quoting 18 U.S.C. § 1519). In holding that fish were not included within the term "tangible object," the Supreme Court concluded that, even if a fish was indisputably a "tangible object" when viewed in a vacuum, it was "highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in financial recordkeeping." *Id.* at 546; *see also id.* at 543 ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.") (internal quotation marks omitted).

Here, reading the VPPA in context, "'a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large.'" *Hernandez*, 2024 WL 72657, at *2 (quoting *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 98 (S.D.N.Y. 2023)). The VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is defined as a person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar *audio visual materials*." *Id.* § 2710(a)(4) (emphasis added). The statute defines a protected "consumer" as "any renter, purchaser, or subscriber of *goods or services* from a *video tape service provider*." *Id.* § 2710(a)(1) (emphasis added). Closing the circle, PII includes only "information which identifies a person as having requested or obtained specific *video materials or services* from a *video tape service provider*." *Id.* § 2710(a)(3) (emphasis added). Taken together, "[t]he principles of statutory construction require defining 'services' consistently within the statutory context"—i.e., *audio visual* services. *Heather*, 2023 WL 8788760, at *2.

The parallel structure of these two statutory definitions—"renter" mirroring "rental", "purchaser" mirroring "sale", and "subscriber" mirroring "delivery"—lends

additional support to this reading. The structural symmetry strongly suggests Congress intended the "goods or services" referenced in the definition of "consumer" to be understood consistently with the goods or services that render a business a "video tape service provider." In other words, the "prerecorded video cassette tapes or similar audio visual materials" that a "video tape service provider" offers for rental, sale, or delivery are the very same "goods or services" that a VPPA "consumer" must rent, purchase, or subscribe to. *See id.* ("[T]he 'services' a subscriber receives are presumptively the same 'services' that would render [Defendant] a 'video tape service provider.'").

In addition to being internally consistent and contextually sound, this natural reading of the VPPA is reinforced by other textual clues. When talking about video stores in the 1980s (the quintessential "video tape service provider" and impetus for the VPPA's passage), it was universally understood that a "renter" rents videotapes, not, for example, snacks or apparel. In the contemporary streaming environment, it is similarly understood that a "subscriber" subscribes to video streaming services. Congress's inclusion of the word "purchaser" in a list that begins with "renter" and ends with "subscriber" suggests its intent for that word to be similarly limited in scope. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) (applying statutory interpretation principle to "avoid ascribing to one word a meaning so broad that it is inconsistent with" "the company it keeps") (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). With the above in mind, that the entire list shares an object—"goods or services"—strongly hints that Congress understood those "goods or services" to be limited to audio visual ones.

Finally, the VPPA's legislative history further confirms Congress's intent to require a nexus between a VPPA consumer's rental, purchase, or subscription and the video content at issue. The Senate Judiciary Committee's report on the VPPA notes that the definition of PII was drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean

that all of its products or services are within the scope of the bill." S. Rep. No. 100-599, at 12 (1988). In fact, the report explains, the VPPA was only intended to govern "those transactions involving the purchase of video tapes and not other products." *Id.* And elsewhere in the report, the Committee describes the VPPA's purpose as "allow[ing] consumers to maintain control over personal information divulged and generated *in exchange for receiving services* from video tape service providers." *Id.* at 8 (emphasis added). PII is, by definition, only information divulged and generated in exchange for receiving *video* services. *See* 18 U.S.C. § 2710(a)(3). This passage is yet more evidence the VPPA is only concerned with "exchanges" that involve the rental, sale, or delivery of audio visual "goods or services."

At bottom, the VPPA text, structure, and history all lead to the same conclusion—the statute is singularly focused on consumers of *video* content. The Court should decline to follow the Second Circuit's expansive and improbable conception of the statute.

3. *Adopting the Second Circuit's conception of a VPPA "consumer" would lead to discordant and unreasonable results.*

"Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982). Plaintiff's preferred interpretation of the term "consumer" in the VPPA would lead to both. For instance, an entirely casual internet surfer who viewed the promotional video content on Insomniac's website would presumably receive no protection from the VPPA because he or she has not rented, purchased, or subscribed to any Insomniac goods or services. However, under Plaintiff's theory, if an otherwise identical internet surfer had, the year prior, purchased a branded t-shirt from an Insomniac booth at a music expo, he or she would enjoy standing under the VPPA. It is highly unlikely Congress intended such an arbitrary and incongruent result.

**D. The Complaint Fails to Plausibly Allege Insomniac "Knowingly" Disclosed Plaintiff's Personally Identifiable Information.**

Plaintiff's VPPA claim fails for yet another reason: The VPPA prohibits only knowing disclosures of PII, i.e., "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Specifically, "[f]or there to be an actionable VPPA violation, the video provider must have *knowingly* disclosed: 1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (emphasis added) (citing 18 U.S.C. § 2710(a)(3)). It is not sufficient "that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing and ... not act[ing] because of some mistake or accident.'" *Id.* (citation omitted). Indeed, "the term 'knowingly' connotes *actual* knowledge." *Id.* (emphasis added). As explained by another court in this District, "'knowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." *Id.* But that is Plaintiff's theory in a nutshell, and it dooms his claim.

Here, Plaintiff alleges Insomniac's knowledge is demonstrated by its decision to "request[] and install[] lines of code" from Facebook, Tik Tok, and other third parties to "track its consumers' interactions with the Website and Apps." Compl. ¶ 18. According to Plaintiff, Insomniac "knew that Plaintiff's and the Class Members' Personal Viewing Information was disclosed to third parties because Defendant programmed the tracking software into the Website's and Apps' code so that third parties would receive the video titles and subscriber's unique third-party identifiers when a subscriber requested and/or viewed a prerecorded video on the Website or Apps." *Id.* ¶ 52. But Insomniac's implementation of the Facebook and TikTok Pixels does not sufficiently allege Insomniac's "actual knowledge" that it was transmitting

PII to Facebook and TikTok.[1] Plaintiff must "allege *facts* giving rise to a reasonable inference that [Insomniac] knowingly . . . disclosed PII to someone other than the consumer." *Mollett v. Netflix, Inc.*, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012) (emphasis added), *aff'd,* 795 F.3d 1062 (9th Cir. 2015).

Even the most basic factual allegations are missing from the Complaint. For example, Plaintiff does not allege Insomniac: (1) knew he had a Facebook account, (2) knew he accessed the Insomniac website from the same browser he used to access his Facebook account, (3) knew or had access to his Facebook identifier, or (4) knew it was disclosing information "concerning any [renter, purchaser, or subscriber]," 18 U.S.C. § 2710(b)(1), as opposed to someone with no relationship to Insomniac. Plaintiff's failure to include these basic factual allegations forecloses his VPPA claim because a party cannot knowingly disclose information it never even possessed. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (implying VPPA defendant could not disclose information it "apparently never even possessed").

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Complaint in its entirety.

---

[1] Nor does Plaintiff's allegation that "Defendant knowingly caused Plaintiff's and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, including Facebook and TikTok," Compl. ¶ 50, save his claim. The VPPA does not prohibit "causing" a disclosure, which may be inadvertent; it prohibits "knowingly disclos[ing]" PII. 18 U.S.C. § 2710(b)(1).

Dated: March 27, 2025

Respectfully submitted,

DTO LAW

By: */s/ William A. Delgado*
William A. Delgado

Attorneys for Defendant
INSOMNIAC HOLDINGS, LLC