**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
Nathaniel Haim Sari (*pro hac vice* forthcoming)
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
nsari@gr-firm.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AUSTIN BALLARD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSOMNIAC HOLDINGS, LLC,<br><br>Defendant. | Case No. 3:25-cv-00811-SI<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: May 30, 2025<br>Time: 10:00 a.m.<br>Place: Courtroom 1, 17th Floor |

## TABLE OF CONTENTS

**PAGE(S)**

STATEMENT OF ISSUES TO BE DECIDED PER CIVIL L.R. 7-4(A)(3) .................................... 1

INTRODUCTION AND STATEMENT OF RELEVANT FACTS ................................................ 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT ....................................................................................................................... 3

I. DEFENDANT IS A VIDEO SERVICE PROVIDER ......................................................... 3

II. THIS COURT SHOULD ADOPT THE SECOND CIRCUIT'S REASONING IN *SALAZAR* AND THE SEVENTH CIRCUIT'S REASONING IN *GARDENER*, WHICH ARE ANALGOUS TO THIS CASE .......................................................................................................... 7

III. PLAINTIFF HAS ADEQUATELY PLED HE IS A CONSUMER UNDER THE VPPA ......................................................................................................... 13

IV. THE SECOND AND SEVENTH CIRCUIT'S CONCLUSIONS ADHERE TO THE VPPA'S PLAIN LANGUAGE AND DO NOT CREATE "DISCORDANT AND UNREASONABLE RESULTS" .................................................. 17

V. DEFENDANT KNOWINGLY DISCLOSED PLAINTIFF'S PII ...................................... 18

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adams v. America's Test Kitchen, LP*,
2023 WL 4304675 (D. Mass. June 30, 2023) ..... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 3

*Belozerov v. Gannett Co.*,
646 F. Supp. 3d 310 (D. Mass. 2022) ..... 20

*Berryman v. Reading Int'l, Inc.*,
2025 WL 315403 (S.D.N.Y. Jan. 28, 2025) ..... 4, 6, 9

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ..... 18

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023) ..... 6

*Carroll v. Chick-fil-A, Inc.*,
2024 WL 1091193 (N.D. Cal. Feb. 13, 2024) ..... 6

*Carter v. Scripps Networks*, LLC,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) ..... 14

*Cleveland v. City of Los Angeles*,
420 F.3d 981 (9th Cir. 2005) ..... 12

*Czarnionka v. Epoch Times Ass'n, Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ..... 20

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ..... 3

*Easlin v. The Coca-Cola Co.*,
136 F. Supp. 3d 654 (E.D. Penn. 2015) ..... 19

*Gardener v. MeTV*,
2023 WL 4365901 (N.D. Ill. July 6, 2023) ..... 14

*Gardner v. Me-TV Nat'l Ltd. P'ship*,
132 F.4th 1022 (7th Cir. 2025) ..... passim

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023)........................................................................ 18

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) ........................................................................ 4

*Goldstein v. Fandango Media, LLC*,
2023 WL 3025111 (S.D. Fla. Mar. 7, 2023) ................................................................ 4

*Haro v. City of Los Angeles*,
745 F.3d 1249 (9th Cir. 2014)................................................................................... 12

*Hernandez v. Container Store, Inc.*,
2024 WL 72657 (C.D. Cal. Jan. 3, 2024)..................................................................... 6

*Hernandez v. Jostens, Inc.*,
2024 WL 1135165 (C.D. Cal. Feb. 7, 2024) ................................................................. 6

*In re Hulu Privacy Litigation*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015)........................................................................ 19

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017)........................................................................ 5

*Jama v. Immigration and Customs Enforcement*,
543 U.S. 335, 125 S. Ct. 694, 160 L. Ed. 2d 708 (2005) ............................................ 16

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022)....................................................................... 20

*Lee v. Springer Nature Am., Inc.*,
2025 WL 692152 (S.D.N.Y. Mar. 4, 2025).................................................................... 4

*Louth v. NFL Enters. LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ................................................................. 19

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023)........................................................................ 19

*Mata v. Zillow Grp., Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ..................................................... 5, 6, 10

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ....................................................................................... 3

*Perrin v. United States*,
444 U.S. 37, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979) ................................................ 13

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024)..................................................................... 5

*Rodriguez v. Hershey Co.*,
2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) ........ 6

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ........ passim

*Salazar v. Paramount Glob.*,
2025 WL 1000139 (6th Cir. Apr. 3, 2025) ........ passim

*Sellers v. Bleacher Rep., Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) ........ 2, 3, 4

*Senne v. Village of Paletine, Ill.*,
695 F. 3d 597 (7th Cir. 2012) ........ 19

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022) ........ 4

*Tawam v. Feld Entm't Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) ........ 6

*Yates v. United States*,
574 U.S. 528 (2015) ........ 11

**STATUTES**

18 U.S.C. § 1519 ........ 11

18 U.S.C. § 2710 ........ 1, 13, 14

18 U.S.C. § 2710(a)(1) ........ passim

## STATEMENT OF ISSUES TO BE DECIDED PER CIVIL L.R. 7-4(a)(3)

1. Whether Plaintiff Austin Ballard ("Plaintiff") states a claim under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA") where Defendant Insomniac Holdings, LLC ("Defendant") intercepted and disclosed Plaintiff's and class members' personally identifiable information and video viewing behavior to third-party Meta Platforms, Inc., via Defendant's website, using the Facebook Tracking Pixel, without consent.

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Plaintiff hereby opposes Defendant's Motion to Dismiss (ECF No. 14) ("MTD"). For the reasons set forth herein, Plaintiff plausibly states a claim for violation of the VPPA because Defendant knowingly and intentionally disclosed Plaintiff's and class members personally identifiable information—namely, a record of video viewing activity by Plaintiff and class members on Defendant's website and mobile application with a unique identifier ("PII")—to unauthorized third parties, without consent. *See* Class Action Complaint ("Compl.") (ECF No. 1), at ¶¶ 1-2; 6-9.

Defendant is an event management company that produces and promotes electronic dance music festivals. *Id.* ¶ 1. Defendant owns and operates a website, www.insomniac.com (the "Website"), and a mobile application known as "Insomniac Events" (the "Mobile App"), through which it offers a library of prerecorded videos showcasing "Insomniac TV," trailers for upcoming events, and recaps of past events. *Id.* In addition to selling tickets for live events on its Website, Defendant also sells apparel, accessories and collectibles, and electronically publishes a subscription newsletter (the "Newsletter") which describes upcoming events and promotions. *Id.* ¶¶ 6, 14, 15. To subscribe to Defendant's Newsletter, the customer must provide his or her email address to Defendant. *Id.* ¶ 15.

When Defendant's customers and/or subscribers to its Newsletter view videos on Defendant's Website and Mobile App, Defendant transmits their PII to Facebook, TikTok, and other third parties through software tracking tools (including the Facebook Pixel, Conversions API, and the TikTok Pixel, among others) that Defendant purposefully installed and configured on its Website and Mobile App. *Id.* ¶¶ 16, 33. But for Defendant implementing the software tracking tools on its Website and Mobile App, neither Facebook nor TikTok nor any other third party would have

received Plaintiff's and class members' PII. *Id.* Defendant controlled and configured what data was tracked, recorded, transmitted to third parties, and intentionally configured the software tracking tools to transmit Plaintiff's and class members' PII to third parties. *Id.* ¶¶ 17-18. Defendant transmitted to Facebook and TikTok both the specific title of the video content watched on Defendant's Website and Mobile App along with a unique identifier that can be used to easily identify the individual watching the video. *Id.* ¶¶ 19-29. At all times material to this action, Plaintiff and class members were unaware of Defendant's conduct because Defendant's transmissions of their PII to third parties is completely invisible to a normal user viewing Defendant's Website and/or Mobile App. *Id.* ¶¶ 30-31 and Figure 1. At no point did Plaintiff or class members consent to Defendant's unauthorized disclosure of their PII to third parties. *Id.* ¶ 35.

Plaintiff had a subscription to Defendant's Newsletter (and in subscribing provided his email to Defendant) and has purchased event tickets from Defendant. *Id.* ¶ 6. Plaintiff also regularly visited Defendant's Website from his computer to watch prerecorded videos. *Id.* Throughout the duration of his interactions with Defendant's Website, Plaintiff used his Facebook account from the same browser he used to view Defendant's video content. *Id.* ¶ 7. Plaintiff also maintains a TikTok account. *Id.* Through the mechanisms described herein, Defendant caused Plaintiff's PII to be transmitted to third parties (including Facebook and TikTok) without his consent. *Id.* ¶¶ 8-9.

As a result of Defendant's unlawful conduct, Plaintiff brings the present action on behalf of himself and "[a]ll persons in the United States who, during the maximum period of time permitted by law, subscribed to Defendant's Newsletter or created an account on Defendant's Website or Apps and viewed prerecorded content using their mobile or computer browsers." *Id.* ¶ 37. Plaintiff brings a claim for violation of the VPPA. *Id.* ¶¶ 46-54.

Defendant now moves to dismiss, but its arguments were considered and rejected by this Court in *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *1 (N.D. Cal. July 28, 2023) (Ilston, J.), as well as by the Second and Seventh Circuits in *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024) and *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022 (7th Cir. 2025), respectively. Therefore, this Court should deny Defendant's MTD in its entirety.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 570. Dismissal is proper under Rule 12(b)(6) "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering Rule 12(b)(6) motions, courts "must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012) (internal quotation marks and citation omitted). However, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I. DEFENDANT IS A VIDEO SERVICE PROVIDER

Defendant claims Plaintiff fails to plausibly allege is it a "video tape service provider" under the VPPA. MTD at 5-8. That is wrong. Plaintiff sufficiently alleges that Defendant is a video tape service provider ("VSP" or "VTSP") because Defendant "offers a massive library of prerecorded videos showcasing Insomniac TV, trailers for upcoming events, and recaps of past events." Compl. ¶ 1; *see also id.* ¶¶ 14, 48. This Court, along with the majority of courts throughout the country, have held that "websites that provide video content as well as other media content — including news organizations — are video tape service providers under the VPPA." *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (Illston, J.) (collecting cases).

Defendant contends that the prerecorded video content on its Website is merely "peripheral" to its business of "operating live music festivals." MTD at 8. Defendant's argument is both premature and incorrect. ***First***, whether Defendant's "business model is tailored to delivery of audio visual materials" delves into "factual questions" ill-suited for resolution "at the motion to dismiss stage." *Id.* at *18; *see also Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 157 (S.D.N.Y. 2023) ("To the extent [defendant] factually disputes the [Complaint's] averments as to [the website's] operation and business model, that argument is premature on a motion to dismiss stage."). This Court's reasoning in *Sellers* is sound: only Defendant knows its core business model and how the video content hosted on its Website impacts its operations. 2023 WL 4850180, at *6.

As another court explained:

> "[T]o answer the question of whether Defendant is a "video tape service provider," the Court must determine the nature of Defendant's business. That determination, however, requires a factual inquiry that goes beyond the pleadings. For example, Defendant claims its business is selling movie tickets and the videos serve to promote this business. However, without additional information regarding how much business Defendant devotes to each of these goals, the Court cannot ascertain the nature of Defendant's business."

*See Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *3 (S.D. Fla. Mar. 7, 2023).

***Second***, Defendant's contentions that it is not a VTSP and that it merely operates "live music festivals" ignore Plaintiff's allegations. MTD at 7-8. The Complaint is clear: "Defendant offers a massive library of prerecorded videos." Compl. ¶ 1. That allegation plausibly establishes that Defendant is a VTSP at the pleadings stage. *See Berryman v. Reading Int'l, Inc.*, 2025 WL 315403, at *3 (S.D.N.Y. Jan. 28, 2025) (holding that a movie theater chain which owns a website where consumers could watch hundreds of "movie trailers" along with the ability to purchase tickets qualified as a "video tape service provider" because that term "has widely been held by courts in this District to include websites and streaming services that deliver online video content to consumers[.]") (collecting cases); *see also Lee v. Springer Nature Am., Inc.*, 2025 WL 692152, at *8 (S.D.N.Y. Mar. 4, 2025) (same); *accord Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 852

(N.D. Cal. 2022) ("[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods.") (quoting *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017))); *accord Rancourt v. Meredith Corp.*, 2024 WL 381344, at *14 (D. Mass. Feb. 1, 2024) ("The App was built in a way that allows users to watch videos within the App. This was not an accidental feature of the App and likely required considerable effort by designers and developers to enable. Even if the Court were to implement Meredith's proposed rule as articulated in *In re Vizio*, it would likely find that the App is substantially involved in and significantly tailored to serve video content to its users.").

***Third***, Defendant's contention that its videos are merely "marketing" materials for its business as an "event management company" is beyond the four corners of the Complaint and therefore an inappropriate basis for dismissal. MTD at 7. Furthermore, that contention is belied by the Complaint, which alleges that the "video content" on Defendant's Website is tailored to (1) entice consumers to "purchase event tickets," and (2) "stay informed of [] upcoming events, promotions and shows." Compl. ¶ 6. It is self-evident that Defendant operates the Website to sell tickets to events—not manage them. As such, it stands to reason that videos on the Website play a core function in Defendant's business by attracting consumers to purchase tickets to events that they would not otherwise attend without having a preview (through the videos) of what those events entail.

*Mata v. Zillow Grp., Inc.*, 2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) is instructive. In *Mata*, the Court found that Zillow's use of "video walkthrough tours" on "Zillow.com" was "essential to [its] business model" because those videos are "what attracts real estate agents and sellers to list their properties on Zillow.com in the first place" by allowing sellers to "find an interested buyer more quickly." *Id.* at *6-7. Similarly, Zillow's use of the videos made the website "a better alternative to other platforms." *Id.* As such, the *Mata* court concluded it was plausible that "defendant's business would fail" without those video offerings. *Id.* at *6-7. Here, as in *Mata*, the videos on Defendant's Website attract consumers and other musical festival vendors (*e.g.*, Live

Nation) to choose Defendant's Website in deciding to purchase tickets and/or host an event, respectively. Further, as in *Mata*, it is probable that Defendant's ticket sales would plummet if consumers could not evaluate and preview Defendant's multi-day music event offerings through its video library. Nor would it be difficult to envision other musical festivals choosing to partner with another company, such as Eventbrite or Fever, if Defendant's Website had poor functionality without its video content.

Defendant's role in promoting events, and the sheer number of videos that it uses to do so, stands in stark opposition to the facts in *Tawam v. Feld Entm't Inc*. In *Tawam,* the court took issue with the limited "volume" of videos used to "increase [the] brand presence" of a company focused on "monster truck events." 684 F. Supp. 3d 1056, 1057 (S.D. Cal. 2023). In contrast to the facts here, the video content at issue in *Tawam* was limited, the events were self-explanatory, and the tickets being marketed could be found on other retail websites. Defendant's citations to other cases concerning container stores,[1] food companies,[2] fashion retailers,[3] or sellers of school memorabilia[4] fare no better. These cases merely stand for the unremarkable proposition that the VPPA does not apply to companies that use limited videos as commercials for tangible products.

On the other hand, when a website hosts a large video library meant to serve as an integral part of a company's business operation—beyond the scope of ordinary advertising—then the VPPA comes into play. That is true even if the audio visual content is only "*part* of the provider's book of business," or even where the business merely "dabble[s] in" such content." *See Berryman*, 2025 WL 315403, at *3 (quoting *Salazar*, 118 F.4th at 548–549).

The sheer volume of videos on Defendant's Website, along with their function, demonstrates that they are not traditional advertisements. Instead, the videos describe the musical festivals, allowing consumers to make informed decisions about whether they want to part with hundreds of dollars before purchasing a ticket. Furthermore, Defendant's Website functions as a

---

[1] *Hernandez v. Container Store, Inc.*, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024).
[2] *Carroll v. Chick-fil-A, Inc.*, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024); *Rodriguez v. Hershey Co.*, 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023).
[3] *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023).
[4] *Hernandez v. Jostens, Inc.*, 2024 WL 1135165, at *2 (C.D. Cal. Feb. 7, 2024).

hub for music festivals hosted across the world—including events in Asia and South America where Defendant does not operate—and the Website's audio visual materials play a crucial role in attracting vendors to promote and sell their events through Defendant's Website. For all of these reasons, Defendant qualifies as a VTSP. Alternatively, at a minimum, the role and purpose of these videos on Defendant's Website raise a factual dispute that cannot be resolved on the pleadings.

## II. THIS COURT SHOULD ADOPT THE SECOND CIRCUIT'S REASONING IN *SALAZAR* AND THE SEVENTH CIRCUIT'S REASONING IN *GARDENER*, WHICH ARE ANALGOUS TO THIS CASE

In *Salazar*, the Second Circuit confronted a near identical situation to the one presented here: the plaintiff signed up for an online newsletter offered by the National Basketball Association ("NBA") and then watched publicly available videos on the NBA's website. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 536 (2d Cir. 2024); Compl. ¶ 6 ("Plaintiff Ballard has had a subscription to Insomniac's newsletter . . . which he has used to stay informed of the upcoming events, promotions and shows advertised by Defendant. Plaintiff Ballard also visited Insomniac's Website to watch prerecorded video content from his computer on a regular basis, as well as to purchase event tickets within the last two years since the filing of this Complaint."). The plaintiff alleged the NBA disclosed "his video-watching history and 'Facebook ID'" to Meta Platforms, Inc. ("Meta") by virtue of using Meta's pixel code on its website. *Salazar*, 118 F.4th at 536; *see also* Compl. ¶ 8 ("Pursuant to the systematic process described herein, Defendant caused Plaintiff Ballard's video consumption to be sent along with his personally identifiable information . . . to Facebook and TikTok without his knowledge or consent each time he requested and viewed video content through the Website."); ¶ 16. The Second Circuit concluded that the plaintiff was a "consumer" for purposes of the VPPA and therefore stated a plausible claim for relief. *Salazar*, 118 F.4th at 550–53. The same result should follow here.

The Second Circuit began its analysis with the statutory definition of "consumer," which means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* at 546 (quoting 18 U.S.C. § 2710(a)(1). Just like Defendant here, the NBA argued that the "statutory context compels the conclusion that a consumer under the VPPA must specifically rent,

purchase, or subscribe to *audiovisual* 'goods or services.'" *Id.* (emphasis in original). "Considering the text, structure, and purpose of the VPAA [sic]," the court rejected the NBA's argument and found that the plain text of the statute rendered the plaintiff a "consumer" under the VPPA because "goods and services" were not limited to only "audiovisual" goods and services. *Id.* Further, because the plaintiff subscribed to the NBA's newsletter and provided "personal information" when he signed up for the same, including "(1) his email address, (2) his IP address, and (3) cookies associated with his device," he qualifies as a "subscriber" under 18 U.S.C. § 2710(a)(1). *Salazar*, 118 F.4th at 552.

The facts of *Salazar* are analogous to the facts of this case, and *Salazar* should be followed because it faithfully applies the plain language of the term "consumer" under the VPPA. Here, Plaintiff is a "consumer" for purposes of the VPPA because he is a "purchaser" of event tickets from Defendant and is a "subscriber" to Defendant's newsletter. Compl. ¶ 6. Subscribing to Defendant's newsletter required that Plaintiff provide his email address. Compl. ¶ 15; ¶ 49 ("Plaintiff and the Class Members are 'consumers' because they subscribed to Defendant's Newsletter, Website and Apps, which provide video content to users, or they purchased audiovisual content from Defendant. In so doing, Plaintiff and the Class Members either entered their email and subscribed to Defendant's Newsletter, or created an account on Defendant's Website and Apps and provided Defendant, at a minimum, their names, emails, addresses, credit card information, and other persistent cookies containing their PII, including the title of the videos they requested and/or viewed."). Therefore, because Plaintiff is both a "purchaser" and a "subscriber," he is a "consumer" under the VPPA pursuant to the plain language of the statute.

Defendant calls *Salazar* an "outlier" (MTD at 10). Yet the Seventh Circuit in *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022 (7th Cir. 2025) just reached the same conclusion as the Second Circuit in *Salazar*. In *Gardner*, the defendant had a website that "invites people to sign up in order to personalize their experience. In exchange for a person's email address and zip code (plus a self-selected user name and password), MeTV lets a person select TV shows to follow, receive reminders about when they come on (like an over-the-air station, MeTV shows programs on a schedule rather than on demand), use a 'channel' finder feature, post comments about the programming, and receive

notices about newly available programs." *Id.* at *1. Similar to the Defendant here, MeTV, "benefits when it can link a viewer to a Facebook account" and incorporated the Meta pixel which "lets Facebook know what the person is watching so it too can sell ads targeted to video preferences, and it improves MeTV's ability to promote its business on Facebook." *Id.* Similar to the facts at issue here, the *Gardner* plaintiffs alleged "they have 'signed up' for MeTV, providing their email addresses and zip codes, and that they watch programming over MeTV while signed into Facebook in the same browser." *Id.* at *2.

MeTV argued that the "plaintiffs subscribed to an *information* service (TV schedules and newsletters), not to a *video* service" and that "[a]nyone can watch videos on the web site without supplying information (other than an IP address)" which, according to MeTV, put the "plaintiffs outside the statutory definition of 'consumer.'" *Id.* Just like the Court in *Salazar*, the Seventh Circuit rejected that argument, reasoning:

> Back to the definition of "consumer", for a third time: "any renter, purchaser, or subscriber of goods or services from a video tape service provider". This does not say "subscriber of ... *video* services"; it says "subscriber of ... services *from a video tape service provider*". The complaint adequately alleges that MeTV is a video tape service provider. What more is required? If plaintiffs had signed up and never watched a video, but had purchased a Flintstones sweatshirt or a Scooby Doo coffee mug or a Superman action figure or a Bugs Bunny puzzle (MeTV's web site offers all four), then they would have purchased "goods" from a "video tape service provider". Nothing in the Act says that the goods or services must be video tapes or streams.

*Id.*; *see also id.* ("Any purchase or subscription from a 'video tape service provider' satisfies the definition of 'consumer', even if the thing purchased is clothing or the thing subscribed to is a newsletter. So the Second Circuit recently held. *Salazar*, 118 F.4th at 546–50. We agree."). The Seventh Circuit correctly determined that MeTV's argument, like Defendant's argument here, "is based more on notions about what Congress was trying to achieve than on the meaning of the words Congress selected" which cannot overcome the plain meaning of the statute. *Id.* at *3. Therefore,

*Salazar* is not an "outlier"; on the contrary, it is the current view of the majority of the circuit courts of appeal to consider the issue.[5]

Defendant continues that "the great weight of authority from courts in the Ninth Circuit (and elsewhere) supports interpreting the words 'goods or services' in the VPPA to mean audio visual goods or services." MTD at 10. It is true that prior to *Salazar*, some district courts within the Ninth Circuit and elsewhere incorrectly cabined the phrase "goods and services" to audio visual goods and services, even though no such limitation appears in the statutory text. However, the most recent authority among district courts in the Ninth Circuit follows the Second Circuit's reasoning in *Salazar*. *See Mata v. Zillow Grp., Inc.*, 2024 WL 5161955 (S.D. Cal. Dec. 18, 2024).

In *Mata*, the plaintiff registered for an account on Zillow.com, which provided "video walkthroughs of available properties." *Id.* at *1. The plaintiff alleged that when watching these video walkthroughs, "third-party tracking technologies obtain their viewing activity and personally identifiable information . . . and transmit that information to third-party tracking vendors [i.e. Facebook] without users' consent." *Id.* Like here, the defendant argued that the plaintiff was not a "consumer" under the VPPA. While the court acknowledged that the "Ninth Circuit has yet to clarify who amounts to a 'subscriber' under the VPPA," the court relied on the Second Circuit's decision in *Salazar* to conclude that the plaintiff was a "consumer" under the VPPA. *Id.* at *3-4. Therefore, courts in the Ninth Circuit are recognizing that *Salazar* was correctly decided. Moreover, this court is not bound by pre-*Salazar* district court cases. Because *Salazar* and *Gardner* present the correct analysis under the VPPA, this Court should adhere to those decisions, like the court in *Mata*.

Next, Defendant argues that "the Second Circuit's interpretation of the VPPA cannot be squared with the plain language of the statute when viewed in its proper context." MTD at 11. But it is Defendant that is trying to read non-textual limitations into the statute that do not exist. Plaintiff is adhering to the plain language of the definition of a "consumer," as set forth above, which is consistent with the Second and Seventh Circuit's approach. *See Gardner*, 132 F.4th at 1025 ("The

[5] Plaintiff acknowledges that the Sixth Circuit reached a contrary conclusion in *Salazar v. Paramount Glob.*, 2025 WL 1000139, at *6–7 (6th Cir. Apr. 3, 2025). However, Plaintiffs submit that the statutory analysis set forth by the Second and Seventh Circuit is more compelling and should be followed here.

Supreme Court insists that it is the language—the only thing on which Congress and the President have agreed—that controls the meaning of legislation.").

Defendant relies on *Yates v. United States*, 574 U.S. 528, 537 (2015), but that case does nothing to cast doubt on the Second Circuit's analysis in *Salazar* or the Seventh Circuit's analysis in *Gardner*. In *Yates*, the defendant was a commercial fisherman convicted of violating 18 U.S.C. § 1519, which "was enacted as part of the Sarbanes–Oxley Act of 2002, 116 Stat. 745, legislation designed to protect investors and restore trust in financial markets following the collapse of Enron Corporation," for disposing of an allegedly undersized red grouper fish that was ordered to be preserved by a federal agent. *Yates*, 574 U.S. at 531–32. The Supreme Court concluded that while a fish is a "tangible object," "it would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with obstructive intent." *Id.* at 532. Given the obvious intent of the statute, the Court held that "[a] tangible object captured by § 1519, we hold, must be one used to record or preserve information." *Id.*

Here, by contrast, the alleged unlawful act by Defendant involves the very same conduct that the VPPA is meant to regulate, namely Defendant's disclosure of Plaintiff's specific video-viewing history without Plaintiff's express written consent. Here, the purpose of the statute and the alleged unlawful act match up, which makes this case wholly distinguishable from *Yates*. As the Second Circuit in *Salazar* explained, Congress intentionally used expansive language in the VPPA to define "consumer," but undoubtedly knew to include an audio visual limitation when it wanted to, because it did so for the definition of "video tape service provider." *Salazar*, 118 F.4th at 546–47; *see id.* at 547 ("This meaningful variation shows that Congress knew to include an audiovisual limitation in the VPPA when it wanted one to apply."). As such, construing Plaintiff as a "consumer" is consistent with the purpose and intent of the VPPA.

Defendant continues that "[t]he parallel structure of these two statutory definitions—'renter' mirroring 'rental', 'purchaser' mirroring 'sale', and 'subscriber' mirroring 'delivery'—lends additional support to this reading." MTD at 12-13. The NBA made the exact same argument in *Salazar*, which the Second Circuit convincingly rejected:

> To the NBA, the phrase "renter, purchaser, or subscriber" in the "consumer" definition is parallel to the "rental, sale, or delivery" language in the "video tape service provider" definition. That means, the NBA says, the term "goods or services" must be parallel to "prerecorded video cassette tapes or similar audio visual materials," with a similarly cabined scope. *Compare* 18 U.S.C. § 2710(a)(1), *with id.* § 2710(a)(4).
>
> We need not decide whether the phrase "renter, purchaser, or subscriber" in the definition of "consumer" is intended to mirror the phrase "rental, sale or delivery" in the definition of "video tape service provider." Even if that were correct, it would not support the NBA's conclusion that the term "goods or services" in the definition of "consumer" mirrors the term "prerecorded video cassette tapes or similar audio visual materials" in the "video tape service provider" definition. Tellingly, Congress chose to *deviate* from any parallelism by using the terms "goods or services" in the "consumer" definition and "prerecorded video cassette tapes or similar audio-visual materials" in the "video tape service provider" definition. Again, Congress's decision to use different words in different definitions strongly signals its intent to convey different meanings. . .

118 F.4th at 547–48. The Second Circuit also properly noted that to construe the VPPA as Defendant would have it construed here would deprive the phrase "personally identifiable information" of meaning and render it superfluous. *Id.* at 548 (explaining "if 'goods or services' are, by definition, audio visual materials, then Congress's express restriction in the definition of 'personally identifiable information' to information about '*video* materials or services' would be superfluous.").

Defendant pivots to its selective review of the legislative history of the VPPA, which it believes supports its construction, but "[a]ccording to the rules of statutory construction, the court can only look to legislative intent when a statute is ambiguous." *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 n.11 (9th Cir. 2005); *see also Haro v. City of Los Angeles*, 745 F.3d 1249, 1257–58 (9th Cir. 2014) ("Here, because the statute is clear on these facts, review of the legislative history is unnecessary."). Here, the VPPA's definition of "consumer" is not ambiguous, and directly supports the conclusion that "consumer" applies to "any renter, purchaser, or subscriber of goods or services from a video tape service provider," without limitation to the specific good or service purchased. *Salazar*, 118 F.4th at 537 (the term "consumer" under the VPPA "is not limited to

*audiovisual* 'goods or services,' and the NBA's online newsletter falls within the plain meaning of that phrase").

### III. PLAINTIFF HAS ADEQUATELY PLED HE IS A CONSUMER UNDER THE VPPA

Plaintiff alleges that he subscribed to Defendant's newsletter, which is a good or service provided by Defendant. And because the VPPA defines a consumer as "any renter, purchaser, or subscriber of goods or services from a video tape service provider," Plaintiff has adequately pleaded he is a consumer. Compl. ¶ 6.; *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1025 (7th Cir. 2025) (holding that a subscription to a VTSP's newsletter was enough to make one a consumer under the VPPA and stating: "What more is required?"); *Salazar*, 118 F.4th at 550 (holding that a subscription to a VTSP's newsletter was enough to make one a consumer under the VPPA").

Defendant claims Plaintiff is not a consumer under the VPPA because Plaintiff did not allege that he "rented, purchased, or subscribed to" audio visual content from Insomniac. MTD at 8. According to Defendant's interpretation of the statute, a person is only a consumer under the VPPA if they rented, purchased, or subscribed to audio visual content from a VTSP. MTD at 8. But Defendant is wrong because the statute imposes no such requirement. *See, e.g.*, 18 U.S.C. § 2710.

To accept Defendant's argument requires the Court to ignore the plain language of the statute and insert text that is not contained in the statute. Specifically, the statute defines consumers as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* The statute does not say that those goods or services must be audio visual. Congress could have included the words "audio visual" before "goods or services" to limit who qualifies as a consumer but chose not to. Since the definition of a consumer in the statute is unambiguous, the court must interpret the statute according to its plain meaning. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

Defendant cites cases where courts have read into the VPPA's definition of consumer that a person must be a renter, purchaser, or subscriber of audio visual goods and services from the VSP. But all of Defendant's citations are to obsolete rulings in the Seventh and Second Circuits, where

courts had originally ruled there must be a nexus between the goods and services and audio visual materials. *See, e.g. Carter v. Scripps Networks*, LLC, 670 F. Supp. 3d 90, 93 (S.D.N.Y. 2023); *Gardener v. MeTV*, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023). The reasoning that underpins Defendant's cited cases has since been rejected by both the Seventh and Second Circuits, who recently interpreted the definition of consumer to mean a renter, purchaser or subscriber of any goods or services from a VSP, just as Congress plainly wrote it. *Salazar*, 118 F.4th at 550 ("The phrase 'goods or services' in the VPPA's definition of 'consumer' is not cabined to only audiovisual 'goods or services.'"); *Gardner*, 132 F.4th 1022, 1025 (7th Cir. 2025) ("Any purchase or subscription from a 'video tape service provider' satisfies the definition of 'consumer', even if the thing purchased is clothing or the thing subscribed to is a newsletter."). Defendant's argument is therefore misplaced.

As Defendant will likely note in its reply, however, the Sixth Circuit has split with the Second and Seventh Circuits by interpreting the definition of consumer to mean a renter, purchaser or subscriber of audio visual goods and services, despite the VPPA not including this language. *Salazar v. Paramount Glob.,* 2025 WL 1000139, at *5 (6th Cir. Apr. 3, 2025). To justify this interpretation, the Sixth Circuit reasons that "goods and services," read in the context of the VPPA statute, must solely refer to audio visual goods and services, since the statute deals with audio visual materials. *Id.* at 13.

As part of its analysis, the Sixth Circuit also looked at the definition of personally identifiable information ("PII") to determine whether PII was meant to limit the scope of the statute instead. *Id*. at 11-13. The VPPA states that PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.S. § 2710. The Sixth Circuit concluded that the wording of the definition of PII was meant to be illustrative as opposed to exhaustive. *Id*. at 15-16. The court therefore believed it unlikely that Congress intended the definition of PII to be the limiting factor in the application of the VPPA, which is the opposite of what the Second Circuit concluded. *Id*. at 17. So, instead, the Sixth Circuit concluded that a consumer must implicitly be limited to individuals that rented, purchased, or subscribed to audio visual content, even though that language does not appear in the statute. *Id*.

Additionally, the Sixth Circuit's reasoning in *Salazar v. Paramount*—that the potential broad definition of PII shows it was not intended to limit the definition of consumer—misses the mark. As the Second Circuit pointed out in *Salazar v. National Basketball Ass'n*, the statute's legislative history shows that even if PII can be interpreted broadly, the statute's text requires PII to be related to specific audio visual material. *Salazar*, 118 F.4th at 549 n.10 ("So while there may be breathing room in the statute to explore what exactly is 'personally identifiable information'—we need not and do not explore that argument in this appeal—the VPPA's text, structure and purpose make clear that the disclosed information must still be related to audiovisual materials or services."). Thus, the protection afforded by the statute would always be tethered to audio visual materials, even if the definition of consumer did not have that limiting language.

Further, it makes sense that "goods or services" would apply broadly, because as the *Paramount* dissent points out, any transaction could give a VSP the data it needs to connect a person with their video consumption activity. *Salazar*, 2025 WL 1000139, at *12 (Donald, J., dissenting) ("When purchasing a hammer on the 'video tape service provider's' website, an individual provides personal information. And the video tape service provider can link that personal information with the free videos the individual later watches on its website. If a video tape service provider can link a person's personal information to their video preferences, Congress would have wanted to prohibit disclosure, regardless of whether the information came from the precise transaction involving the video material or got 'stitched together' with other non-video transactions.").

And as the Second Circuit in both *Salazar v. National Basketball Ass'n* and the *Paramount* dissent points out, VSPs historically provided other non-audio visual goods and services. *Id*. at 29 ("…Congress knew that 'video tape service providers' could rent, sell, or deliver other types of 'goods or services' too. Remember that the definition was drafted to include department stores, supermarkets, and other entities that rent, sell, or deliver the requisite audiovisual materials.); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 548 (2d Cir. 2024) ("Congress cast a wide net in defining 'video tape service provider,' to ensure that businesses dealing in audiovisual goods or services satisfy the definition even if they also deal in non-audiovisual goods or services.").

This was the case at the time the statute was crafted, yet Congress chose not to write into the statutory definition that a consumer must subscribe, rent or purchase specifically audio visual goods and services. It would therefore be an unnatural reading of the statute to infer that, during a time when VSPs sold other goods or services, the legislature intended "goods or services" to only apply to audio visual goods or services without expressly writing it into the statute. *Salazar*, 2025 WL 1000139, at *9–10 (Donald, J., dissenting) (stating that because Congress was aware of VSPs provision of goods and services that were not solely audio visual, it would be an unnatural reading of the statute to presume that "goods and services" meant only audio visual). Interpreting the statute to allow a VTSP to disclose a consumer's video viewing information with impunity when a customer purchases or subscribes to one subset of a VTSP's offered goods or services but not another, would be "out of sync with the statute's goals." *Salazar*, 118 F.4th at 550.

In its *NBA* opinion, the Second Circuit also reasons that because "audio visual material" is included in the definition of VTSP but excluded from the definition of consumer, Congress must have intentionally excluded it. *Salazar*, 118 F.4th at 547 ("This meaningful variation shows that Congress knew to include an audiovisual limitation in the VPPA when it wanted one to apply."); *see also Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341, 125 S. Ct. 694, 160 L. Ed. 2d 708 (2005) ("lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply" especially when it "has shown elsewhere in the same statute that it knows how to make such a requirement manifest.")

As discussed in section II, *supra*, this Court should favor the reasoning of the Second and Seventh Circuits. As the Second and Seventh Circuits point out in *Salazar* and *Gardner*, respectively, as well as in the *Paramount* dissent, a plain reading of the statute makes the definition of consumer clear, without the need to insert words. *Salazar*, 118 F.4th at 549 ("Grafting unstated limitations on the broad definition of 'consumer,' and by extension, 'goods or services,' would be inconsistent with Congress's purpose here."); *Gardner*, 132 F.4th at 1027 ("Nothing in the Acts says the goods or services must be video tapes or streams."); *Salazar*, 2025 WL 1000139, at *9–10 (Donald, J., dissenting) (agreeing with the Seventh and Second Circuits that "audiovisual" cannot be inserted into

the definition of consumer to modify the "goods and services" part of the definition). Nothing about the definition of "consumer" is "inconsistent with its accompanying words" nor does it "render meaningless" other parts of the statute or depart from the statute's purpose. *Salazar*, 2025 WL 1000139, at *12–13 (6th Cir. Apr. 3, 2025) (Donald, J., dissenting).

The Second and Seventh Circuits' interpretation of the statute is more logical than the Sixth Circuit's interpretation. Congress passed the VPPA partly in response to a leak of Justice Nominee Bork's video viewing preferences from a VTSP. *Salazar*, 118 F.4th at 544. Congress devised the statute to protect the public's video viewing privacy by creating a legal remedy for consumers whose VTSPs expose such information. VTSPs are the appropriate targets of the statute, because by nature of their business, VTSPs collect and store intimate data of a person's viewing habits. Through the VPPA, Congress raised the standard to which VTSPs are held when preserving consumers' privacy. That goal is best upheld through the Second and Seventh Circuits' interpretation of the definition of consumer.

It would not make sense for Congress to limit consumers' privacy protections based on whether the consumer purchased, rented or subscribed to solely the audio visual goods or services of a VTSP. Regardless of how the relationship with the VTSP is formed, a customer's video viewing data is worthy of protection: this is evident from how expansively Congress chose to define a consumer under the VPPA. In light of the goal of the VPPA—to protect the public's video viewing habits—and its historical context, it would be an odd result that VTSPs, which by the unique nature of their business, acquire and store intimate video viewing data of their customers, would only be liable for exposure of that data if the customers also purchased, rented or subscribed to audio visual content. Accordingly, the Court should follow the reasoning of the Second and Seventh Circuits and find that Plaintiff has adequately pled that he is a consumer under the VPPA.

## IV. THE SECOND AND SEVENTH CIRCUIT'S CONCLUSIONS ADHERE TO THE VPPA'S PLAIN LANGUAGE AND DO NOT CREATE "DISCORDANT AND UNREASONABLE RESULTS"

Defendant argues that Plaintiff's interpretation of the VPPA would lead to unreasonable results because a "casual internet surfer who viewed the promotional video content on Insomniac's

website would . . . receive no protection from the VPPA because he or she has not rented, purchased, or subscribed to any Insomniac goods or services . . . [whereas] if an otherwise identical internet surfer had, the year prior, purchased a branded t-shirt from an Insomniac booth at a music expo, he or she would enjoy standing under the VPPA." MTD at 14. But Defendant's policy arguments cannot overcome the plain language of the statute, which controls. *Salazar*, 118 F.4th at 550 (rejecting the very same type of hypothetical and concluding that it did "not justify artificially cabining the statute's scope in a way that is inconsistent with its plain meaning and purpose"); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.").

Further, it is unclear why Defendant's hypothetical is unreasonable, as the Second Circuit found:

> We're also unconvinced that broadly defining "goods or services" produces anomalous results. Take the NBA's hypothetical: a consumer buys a hammer, then watches free videos on the vendor's website. The NBA suggests that it is anomalous that this consumer is subject to privacy protections under the VPPA. But considering the privacy protective goals of the VPPA with respect to individuals' video viewing information, this scenario does not strike us as anomalous. Especially given the broad definition of consumer in the VPPA, *allowing* disclosure of the consumer's video viewing information would be out of sync with the statute's goals.

*Salazar*, 118 F.4th at 550.

## V. DEFENDANT KNOWINGLY DISCLOSED PLAINTIFF'S PII

Defendant contends that Plaintiff fails to allege it disclosed personally identifiable information "knowingly." *See* MTD at 24–25. That assertion ignores the numerous allegations in the Complaint that unmistakably demonstrate that Defendant knew it was disclosing Plaintiffs' personally identifiable information to third parties. *See* Compl. ¶¶ 2, 16-18, 50. Other courts in this District have found similar allegations to be sufficient to establish the "knowing" element of a VPPA claim. *See Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721 (N.D. Cal. 2023) ("allegations that defendant knowingly used the Pixel, provided FIDs and URLs to Meta sufficiently alleges a

knowing disclosure"); *Markels v. AARP*, 689 F. Supp. 3d 722, 729 (N.D. Cal. 2023) ("At this stage, plaintiffs' allegations that defendant knowingly installed the Pixel and shared plaintiffs' information is adequate.").

A defendant discloses PII knowingly when it possesses "consciousness of transmitting the private information." *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). This approach is "consistent with cases that have explained the knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the VPPA was modeled." *Id.* It does not matter whether the defendant possesses "knowledge of illegality or potential consequences," *see Senne v. Village of Paletine, Ill.*, 695 F. 3d 597, 603 (7th Cir. 2012), nor does it matter whether "third parties actually see the disclosed information to constitute a violation." *Easlin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 671 (E.D. Penn. 2015). Instead, a video tape service provider violates the VPPA by consciously transmitting: "1) a user's identity; 2) the identity of the video material; and 3) the connection between the two—*i.e.*, that the given user had 'requested or obtained' the given video material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1097.

Plaintiffs plausibly pleads that Defendant disclosed his personally identifiable information knowingly. Specifically, Plaintiff alleges that Defendant purposely installed and implemented the Facebook and TikTok tracking tools on its Website and Apps, which it knew transmitted Plaintiff's and class members Personal Viewing Information to unauthorized third parties. Compl. ¶ 16. Defendant had full control over the data tracked, recorded, and transmitted to third parties. *Id.* ¶ 17. Defendant's knowledge is evidenced by the fact that: "(1) it chose to track its consumers' interactions with the Website and Apps, including their requests to view trailers, recaps and Insomniac TV; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook, TikTok and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the Apps."

Numerous courts in this District, including in *Ghanaat* and *Markels*, have found such allegations sufficient to plead knowledge, and other courts also agree. *Louth v. NFL Enters. LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) ("[I]t can reasonably be inferred that NFL

Enterprises knowingly transmitted PII for the purpose of targeted advertising."); *see also Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 315 (D. Mass. 2022) (knowledge plausibly pleaded where the "defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscriber's FID [and that] defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook"); *Adams v. America's Test Kitchen, LP*, 2023 WL 4304675, at *7 (D. Mass. June 30, 2023) (finding plaintiff adequately alleged the defendants "knowingly disclosed" personally identifiable information); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342–43 (N.D. Ga. 2022) ("The Court finds that Lebakken does plausibly allege WebMD's conscious transmission of its consumers' private information, and thus, WebMD is not entitled to dismissal of the First Amended Complaint on that ground."); *Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (finding knowledge plausibly pleaded based on similar allegations).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss. Should the Court find dismissal of any claims warranted, Plaintiff respectfully seeks leave to amend the Complaint.

Dated: April 24, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *_/s/ Philip L. Fraietta_*

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
Nathaniel Sari (*pro hac vice* forthcoming)
140 Broadway, Suite 4667
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
nsari@gr-firm.com

*Attorneys for Plaintiff*