UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN BALLARD,<br><br>        Plaintiff,<br><br>    v.<br><br>INSOMNIAC HOLDINGS, LLC,<br><br>        Defendant. | Case No. 25-cv-00811-SI<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 14 |

Before the Court is defendant's motion to dismiss. The court held a hearing on June 6, 2025. For the reasons discussed below, the motion to dismiss is **DENIED**.

**BACKGROUND**

Plaintiff Austin Ballard brings this proposed class action against defendant Insomniac Holdings LLC ("Insomniac"), asserting one claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. The complaint alleges that defendant knowingly and intentionally disclosed its users' personally identifiable information ("PII") to unauthorized third parties, namely Facebook and TikTok. Dkt. No 1, Compl. Plaintiff alleges the following facts, which are taken as true for the purposes of a motion to dismiss. *See Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015).

Insomniac is an "event management company" that "produc[es] and promot[es]" electronic dance music festivals and events. Compl. ¶ 1. It owns and operates a website and mobile app entitled www.insomniac.com and "Insomniac Events," respectively. *Id.* Insomniac also offers a newsletter which, among other things, "provides access to exclusive ticket presale codes, festival announcements and information, new music releases, playlists, and ongoing contests and

giveaways." *Id.* ¶ 6 n.1. Through its website, newsletter, and app, Insomniac "showcases trailers, recaps, and Insomniac TV prerecorded video content[.]" *Id.* ¶ 14. Creating an account on the Insomniac mobile app or signing up for its promotional newsletter requires providing one's email. *Id.* ¶ 15.

Plaintiff alleges that he "has had a subscription to Insomniac's newsletter . . ., which he has used to stay informed of the upcoming events, promotions and shows advertised by Defendant." *Id.* ¶ 6. Plaintiff also has accounts with both TikTok and Facebook. *Id.* ¶ 7. He alleges that he regularly visited defendant's website to "watch prerecorded videos" and to purchase event tickets, from the same web browser that he used to maintain his Facebook account. *Id.* ¶¶ 6-7. The complaint alleges that Insomniac "caused Plaintiff Ballard's video consumption to be sent along with his personally identifiable information ('PII') to Facebook and TikTok without his knowledge or consent each time he requested and viewed video content through the Website." *Id.* ¶ 8; *see also id.* ¶ 28.

According to the complaint, defendant installed tracking tools via lines of codes from Facebook, the "Facebook pixel," and from TikTok, "TikTok Pixels," on Insomniac's website and app. *Id.* ¶ 18. These tracking tools function to transmit tracked information, including the titles of specific videos that users requested and/or viewed, to Facebook, TikTok, and "other unauthorized third parties." *Id.* ¶¶ 16, 21. The information transmitted to Facebook identifies subscribers based on their "unique and persistent" Facebook IDs ("FID"), which any ordinary person can use to identify an individual and their corresponding Facebook profile. *Id.* ¶¶ 23, 25. Similarly, the information transmitted to TikTok via the pixel identifies subscribers "based on their unique and persistent TikTok identifiers" together with the title of the video content viewed or requested by the subscriber. *Id.* ¶¶ 26-27. Plaintiff alleges that defendant "controlled which data was tracked, recorded, and transmitted when its subscribers requested or viewed its prerecorded video content." *Id.* ¶ 17. Plaintiff further alleges that defendant uses these tracking tools for "marketing purposes" and that their use "financially benefits Defendant through advertising and information services that Defendant would otherwise have to pay for." *Id.* ¶¶ 20, 22.

Defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether to grant a motion to dismiss, the Court must assume the plaintiff's allegations are true and must draw all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings. *Id.* at 688-89. The court may also consider "documents attached to the complaint [and] documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**DISCUSSION**

"[T]o plead a plausible claim under section 2710(b)(1) of the VPPA, a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett*, 795 F.3d at 1066.

3

Defendant argues that plaintiff failed to plausibly allege that: (a) Insomniac is a video tape service provider, (b) that plaintiff is a "consumer" under the VPPA, and (c) that defendant "knowingly" disclosed personally identifiable information. The Court takes these arguments in turn.

**I.     Video Tape Service Provider**

Defendant argues that it is not a video tape service provider as defined by the VPPA. Dkt. No. 14, Mot. at 5. The VPPA defines "video tape service provider" ("VTSP") in relevant part, to mean "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4). Defendant argues that plaintiff failed to sufficiently allege that Insomniac is "engaged in the business" of renting, selling, or delivering video content. Mot. at 7-8. Defendant contends, rather, that "the only reasonable inference" supported by the complaint is that the conveyance of "audio visual materials" is "no more than peripheral" to Insomniac's core business of "operating live music festivals." *Id.* at 8. Plaintiff argues that these assertions pose factual questions "ill-suited for resolution" at the motion to dismiss stage. Dkt. No. 22, Opp'n at 4. The Court agrees with plaintiff's argument

. "In interpreting the statute's definition of "video tape service provider," district courts have held that the term "engaged in the business" of renting, selling, or delivering video content "connotes 'a particular field of endeavor,' i.e., a focus of the defendant's work." *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (citations omitted). Thus, courts have held that "peripherally or passively" "hosting and creating" prerecorded videos for marketing purposes does not suffice to qualify an entity as a VTSP. *See id.* at 1221-22; *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal 2023). Instead, "[t]he plaintiff must sufficiently allege that the defendant's products are specifically tailored to serve audiovisual material." *Cantu*, 697 F. Supp. 3d at 993 (citation and internal quotation marks omitted).

At this stage, defendant's argument raises a factual dispute into the role prerecorded video content plays in its business model and is thus premature. While district courts within the Ninth Circuit have dismissed VPPA claims based on similar arguments defendant raises here, courts have

4

1  done this where no reasonable inference could be made that the videos in question were "more than
2  peripheral" to the defendant's business. *See, e.g.*, *Cantu*, 697 F. Supp. 3d at 994-95 (Coach
3  handbags). Conversely, a court in this district held that plaintiffs had plausibly alleged that the
4  social network Facebook is a video tape service provider where the plaintiffs had alleged "that
5  Facebook 'regularly delivers' video content to users and maintains a cache of videos and visual
6  materials, including from content providers like Netflix, for their delivery to users." *In re Facebook,
7  Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019). In another
8  case, this Court held that it was reasonable to infer from the complaint that the defendant was a
9  VTSP, where the plaintiff alleged the defendant's website offered "articles and videos" about sports
10 and sports culture. *See Sellers v. Bleacher Rep., Inc.*, No. 23-cv-368-SI, 2023 WL 4850180, at *1,
11 6 (N.D. Cal. July 28, 2023).

12  In their papers and at the hearing, defendant relies on *Tawam v. Feld Entertainment Inc.*,
13 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023). In *Tawam*, the defendant was a corporation that "owns
14 and promotes monster truck events and rallies" across the country. *Id.* at 1057. The company's
15 website delivered promotional video content and the plaintiffs alleged that they viewed two videos
16 on the website. *Id.* In finding the complaint did not plausibly allege the defendant was a VTSP, the
17 court observed that "the allegations in the FAC concerning the volume and role of the video content
18 at issue in this case do not support an inference that the videos viewed by Plaintiffs are more than
19 peripheral to Defendant's business or that Defendant's website is significantly tailored to the
20 purpose of conveying those videos." *Id.* at 1061. Here, the line is less clear. Plaintiff has alleged
21 that Insomniac "offers a massive library of prerecorded videos showcasing Insomniac TV, trailers
22 for upcoming events, and recaps of past events." Compl. ¶ 1. He alleges that he watched this
23 prerecorded video content from his computer on a regular basis. *Id.* ¶ 6. For purposes of a motion
24 to dismiss, the Court finds plaintiff has sufficiently alleged that the video content he watched on
25 Insomniac's website was more than peripheral to the business model of a company that manages
26 music festivals—an audio visual experience.

### II. Consumer

The VPPA defines "consumer," to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). Defendant argues that plaintiff fails to allege he is a consumer under the VPPA and that the statutory context of the VPPA specifically requires that plaintiff be a renter, purchaser, or subscriber *of audio visual* content from Insomniac. Mot. at 8, 11. Thus, defendant argues, plaintiff's claim fails because his subscription to the Insomniac newsletter and his ticket purchases are not sufficiently tied to the video content he viewed while visiting Insomniac's website. *Id.* at 10. Plaintiff counters that the VPPA's plain language does not impose such a requirement and that he qualifies as a consumer because the Insomniac newsletter he subscribed to is a "good or service" provided by the defendant. Opp'n at 13.

Payment is not a necessary element of subscription under the VPPA's "consumer" section, although courts have emphasized that subscription "involves some type of commitment, relationship, or association." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (finding the plaintiff adequately alleged that he was a subscriber as he "established a relationship with [the defendant] that [wa]s materially different" than if he had not downloaded the app). This "commitment," however, can be shown through factors beyond payment such as registration, delivery, or access to restricted content. *See Ellis*, 803 F.3d at 1256-57 (holding that the plaintiff was not a consumer under the VPPA, because he failed to "establish an account" with or "provide any personal information" to the defendant to use its app).

Circuits are split, however, and the Ninth Circuit has not yet spoken, on whether the VPPA requires that a user be subscribed directly *to the audio visual content* from the VTSP in question, or whether the term "good and services" within the statute covers subscriptions of *any* goods and services from the VTSP. *See Salazar v. Paramount Glob.*, 133 F.4th 642 (6th Cir. 2025) (holding that a person is only a subscriber under the VPPA when he subscribes to goods or services "in the nature of 'video cassette tapes or similar audio visual materials'"); *see also Heather v. Healthline Media Inc.*, No. 22-cv-05059-JD, 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023) (dismissing

6

1    VPPA claim in which the plaintiff had only subscribed to a newsletter "comprised primarily of text
2    and occasional external hyperlinks to video content"). *But see Salazar v. Nat'l Basketball Ass'n*,
3    118 F.4th 533 (2d Cir. 2024) (finding the plaintiff plausibly pled he was a "subscriber of goods or
4    services" under the VPPA even though the newsletter he signed up for was not audio visual in
5    nature).

6          Courts that adopt the interpretation of "consumer" which cabins the term "goods and
7    services" to audio visual material point to statutory context and the associated words cannon. In
8    *Paramount Global*, the Sixth Circuit held that the plaintiff erred by "reading the terms 'good or
9    services' 'in isolation.'" *Paramount Glob.*, 133 F.4th 642 at 649 (quoting *Dublin v. United States*,
10   599 U.S. 110, 110 (2023)). The court affirmed the district court's dismissal of the plaintiff's claim,
11   reasoning that the complaint failed to allege that he "accessed videos through the newsletter" he had
12   signed up for. *Id.* at 652. The court further held that the "the most natural reading" of the term
13   'goods and services' accounts for the context of the statute's definitions of both "VTSP" and
14   "consumer," as the latter only "encompass[es]" consumers of goods and services from a VTSP. *Id.*
15   at 650. As the definition of a VTSP is qualified by "prerecorded video cassette tapes or audio visual
16   material[,]" the Sixth Circuit, and other courts following this interpretation, reason that the term
17   "consumer" is similarly qualified. *See id.* (citing *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 459
18   (2022)).

19         On the other hand, courts which have declined to read an "audiovisual limitation" into the
20   definition of "consumer" point to the plain language of the statute. *See Nat'l Basketball Ass'n*,, 118
21   F.4th at 547. The Second Circuit noted that Congress "chose to *deviate* from any parallelism" to
22   the definition of a VTSP by omitting the phrase "prerecorded video cassette tapes or similar audio-
23   visual materials" from the consumer definition. *See id.* at 548. In *Gardner v. Me-TV National*
24   *Limited Partnership*, the Seventh Circuit followed the Second Circuit's interpretation, holding that
25   the plaintiffs had sufficiently pled they were "subscribers" within the meaning of the VPPA, as they
26   provided the defendant personal information (email address and zip code) in exchange for a
27   subscription to its newsletter. 132 F.4th 1022, 1024-25 (7th Cir. 2025). While the defendant there
28   argued that the plaintiff had subscribed merely to "an information service[,]" and that "[a]nyone

c[ould] watch videos on the website without supplying information[,]" the Seventh Circuit held that the plaintiffs had adequately alleged that they had subscribed to services from a VTSP. *Id.* The court emphasized that the definition of consumer "does not say 'subscriber of … *video* services'; it says, 'subscriber of … services *from a video tape service provider*.' The complaint adequately alleges that MeTV is a video tape service provider. What more is required?" *Id.* at 1025. The court went on, "Any purchase or subscription from a 'video tape service provider' satisfies the definition of 'consumer', even if the thing purchased is clothing or the thing subscribed to is a newsletter." *Id.*

Judges in this district have come out on different sides of the question of who qualifies as a consumer under the VPPA, in decisions that pre-date the rulings of the Second, Sixth, and Seventh Circuits. In *In re Hulu Privacy Litigation*, the court reiterated that "while the terms 'renter' and 'buyer' necessarily imply payment of money, the term 'subscriber' does not." No. C 11-03764-LB, 2012 WL 3282960, at *8 (N.D. Cal. Aug. 10, 2012). The *Hulu* court reasoned that if Congress wanted to limit the word "'subscriber' to 'paid subscriber,' it would have said so." *Id.* Similarly, some courts in this district have found a plaintiff to be a subscriber under the VPPA where the plaintiff had "signed up[,]" or been subscribed, directly to a website that contains video content, even where these subscriptions are not paid. *See Jackson v. Fandom*, No. 22-cv-04423-JST, 2023 WL 4670285 (N.D. Cal. Jul. 20, 2023); *see also Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 722-23 (Judge Gonzalez Rogers finding that in providing their name and email address to register for accounts with defendant's website, the plaintiffs had plausibly alleged that they were subscribers within the meaning of the VPPA.). In *Heather*, however, the district court rejected the notion that providing one's email address in order to subscribe to a newsletter qualifies one as a "subscriber" under the VPPA. *Heather* more squarely addressed the question presented on this motion, whether the service subscribed to must be a "video-related" one. *See Heather*, 2023 WL 8788760, at *1-2. Where the *Heather* plaintiffs alleged they subscribed to a newsletter "comprised primarily of text and occasional external hyperlinks to video content," the court dismissed the VPPA claim, reasoning that "the 'services' a subscriber receives are presumptively the same 'services' that would render [the defendant] a 'video tape service provider.'" *Id.* at *2.

8

1  Defendant again relies on the district court's decision in *Tawam*, which involved an owner and promoter of monster truck rallies. The plaintiff alleged that after viewing video content on the defendant's website, the plaintiff signed up for the defendant's email "list serve." 684 F. Supp. 3d at 1058. Much like the case before us, the defendant in *Tawam* argued that the plaintiff was not a qualifying consumer under the VPPA, as he merely subscribed to an email list separate and distinct from the "free video" content. *Id.* The *Tawam* court rejected the notion that the plaintiff's subscription to the list serve rendered him a subscriber under the VPPA. Relying on the district court case that the Seventh Circuit later reversed, the *Tawam* court reasoned that the VPPA required a "factual nexus" between the plaintiff's subscription and the "allegedly actionable video content." *Id.* at 1061 (quoting *Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023), *rev'd* 132 F.4th 1022 (2025)). The *Tawam* court also relied on case law that has since been implicitly overruled in the Second Circuit. *Compare Carter v. Scripps Networks, LLC*, 670 F.Supp.3d 90, 99 (S.D.N.Y. Apr. 24, 2023) ("Plaintiff's Newsletter Subscriptions Do Not Make them 'Subscribers' Covered by the VPPA") *with Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024) (finding the plaintiff's subscription to the NBA newsletter to "satisfy the [subscriber] requirement[.]").

This Court agrees with the Second and Seventh Circuits' plain reading of the statute and finds that the definition of "consumer" in the VPPA is not cabined to "audio visual" goods and services, as Congress chose to omit an "audio visual" clause from the consumer definition. Accordingly, plaintiff has plausibly pled that he is a subscriber under the VPPA. The personal information he provided defendant in order to sign up for the newsletter—his name and email address—established a materially different relationship between him and Insomniac which gave him access to "exclusive or restricted content." *See Ellis*, 803 F.3d at 1257; *Yershov,* 820 F.3d 482 at 489; Compl. ¶ 6 n.1 ("signing up for Insomniac's newsletter provides access to exclusive ticket presale codes, festival announcements and information, new music releases, playlists . . ."). Under the Second and Seventh Circuits' reading of the term "goods and services" in the "consumer" definition, plaintiff's subscription to Insomniac's newsletter renders him a consumer under the VPPA, assuming (as the Court has found) that he adequately pled that defendant was a VTSP. *See*

9

*Gardner*, 132 F.4th 1022, 1024-25; *see Nat'l Basketball Ass'n*, 118 F.4th 533 at 550; Compl. ¶ 49. The Court holds at this stage that, regardless of any lack of connection between the Insomniac newsletter and the video content plaintiff viewed, his newsletter subscription brings him within the definition of "consumer" under the VPPA.

In so ruling, the Court notes this issue is developing rapidly as courts are being asked to apply the VPPA to new technology. As noted above, many of the district court decisions ruling on the "consumer" question issued before the Second, Sixth, and Seventh Circuits' decisions, and the *Heather* decision is currently on appeal to the Ninth Circuit. *See Heather v. Healthline Media, Inc.*, No. 24-4168 at Dkt. No. 29 (9th Cir. filed July 8, 2024). As discussed at the hearing, should controlling law change on this point, defendant may request that the Court revisit the matter.

At this time, the Court holds that plaintiff has sufficiently alleged that he is a subscriber of the newsletter, which constitutes a "good[] or service[] from a video tape service provider," as required by the VPPA. *Id.* at 1025 (emphasis omitted).[1][2]

### III.  Knowing Disclosure

Finally, defendant argues that plaintiff failed to plausibly allege that it knowingly disclosed his PII. The VPPA defines "personally identifiable information," to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The VPPA punishes disclosures only when they are made "knowingly." 18 U.S.C. § 2710(b)(1). Defendant argues, *inter alia*, that plaintiff's claim is deficient because he did not include facts regarding whether defendant knew that plaintiff had a Facebook account or that defendant "knew or had access" to his Facebook identifier. *See* Mot. at

---

[1] Plaintiff alternatively contends that he is a "purchaser" within the meaning of the VPPA, as he used the Website to purchase event tickets. The Court need not and does not reach that alternative argument.

[2] As the Court does not find that plaintiff was required to allege he subscribed directly to the audio visual material, whether or not Insomniac's video content is publicly available is not dispositive of this motion. The Court thus declines at this time to take judicial notice of the Insomniac website as requested by defendant. *See* Dkt. No. 14-1.

16. Defendant further argues that it did not have "actual knowledge" that it was disclosing PII. *See id.* at 15.

Defendant relies, in part, on a Ninth Circuit opinion which affirmed a dismissal where the defendant did not disclose information it "apparently never even possessed." *See Eichenberger v. ESPN*, Inc., 876 F.3d 979, 986 (9th Cir. 2017). The present case is distinguishable, as here plaintiff alleged that "defendant controlled" the tracked and recorded data, which included users' "[p]ersonal viewing information" as well as "unique identifiers[.]" *See* Compl. ¶¶ 16-17, 23, 27. The complaint further alleges that Insomniac purposely installed the Facebook Pixel and TikTok Pixels on its website and apps, and that it controlled the information that was tracked, recorded, and transmitted. *Id.* ¶ 16. Moreover, the complaint alleges that any ordinary person can use the Facebook and TikTok identifiers that Insomniac discloses to identify individuals. *Id.* ¶ 25. These factual allegations are enough at this stage for the Court to reasonably infer that defendant knowingly disclosed personally identifiable information. *See Ghanaat*, 689 F. Supp. 3d at 722-23 (holding plaintiff plausibly alleged scienter requirement).

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's motion to dismiss.

**IT IS SO ORDERED**.

Dated: June 17, 2025

SUSAN ILLSTON
United States District Judge